UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ROBERT LEE DERRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:15-cv-396 |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Robert Lee Derry, on December 23, 2015.[2] For the following reasons, the decision of the Commissioner is **REMANDED.**

*Background*

The plaintiff, Robert Lee Derry, filed an application for Disability Insurance Benefits and Supplemental Security Income on April 1, 2013, alleging a disability onset date of May 3, 2012. (Tr. 43). The Disability Determination Bureau denied Derry's application on May 28, 2013, and again upon reconsideration on July 26, 2013. (Tr. 43). Derry subsequently filed a timely request for a hearing on August 29, 2013. (Tr. 43). A hearing was held on February 14, 2014, before Administrative Law Judge (ALJ) Maryann S. Bright, and the ALJ issued an unfavorable decision

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] On April 1, 2016, this case was reassigned to Magistrate Judge Susan L. Collins upon the parties' consent under 28 U.S.C. § 636(c), and then was reassigned to Magistrate Judge Andrew P. Rodovich. On October 12, 2016, the court ordered the parties to file any objection to Magistrate Judge Rodovich conducting all further proceedings in this case. Because neither party filed an objection, this court finds that the parties voluntarily consent to Magistrate Judge Rodovich under 28 U.S.C. § 636(c).

on May 14, 2014. (Tr. 43-53). Vocational Expert (VE) Sharon D. Ringenberg and Derry testified at the hearing. (Tr. 43). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

The ALJ found that Derry met the insured status requirements of the Social Security Act through March 31, 2017. (Tr. 45). At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found the Derry had not engaged in substantial gainful activity since May 3, 2012, the alleged onset date. (Tr. 45). At step two, the ALJ determined that Derry had the following severe impairments: obesity, bipolar I disorder, and polysubstance dependence. (Tr. 45). The ALJ concluded that a knee injury mentioned by Derry was not a medically determinable impairment. (Tr. 45). There were no medical records of the injury or allegations that it hindered him in any way. (Tr. 45). Also, the ALJ indicated that there was no evidence in the physicians' chart notes, reports, or any allegations made by Derry or others that his obesity taken singly or in combination with other impairments reached the level of medical equivalence to a listing. (Tr. 46).

At step three, the ALJ concluded that Derry did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 46). Specifically, the ALJ determined that Derry's mental impairments did not meet or medically equal listing 12.04, Affective Disorders, or 12.09, Substance Addiction Disorders. (Tr. 46). She considered the paragraph B criteria for mental impairments, which required at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

2

(Tr. 46). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 46).

The ALJ found that Derry had mild restrictions in daily living activities. (Tr. 46). She noted that Derry did household chores, prepared meals, shopped for groceries, and cared appropriately for his grooming and hygiene. (Tr. 46). The ALJ found that Derry had moderate difficulties in social functioning. (Tr. 46). The ALJ noted that Derry did not have a history of altercations or difficulty getting along with authority figures. (Tr. 46). Derry indicated that he avoided social interaction because of mood swings and paranoia. (Tr. 46). However, he testified that he was able to deal with cashiers when shopping and with acquaintances when playing tabletop games. (Tr. 46).

The ALJ found that Derry had moderate difficulties in concentration, persistence, or pace. (Tr. 46). Derry indicated that he had difficulty concentrating, but acknowledged that he could pay attention up to three hours at a time. (Tr. 46). Later, he reported a 30 minute period of attention, which the ALJ noted as inconsistent with his testimony that playing tabletop games could last for about two hours. (Tr. 46). Derry had well developed mental arithmetic skills and did several serial 7 subtractions quickly and without error at the consultative psychological examination. (Tr. 46). The consultative psychologist determined that Derry's long-term, intermediate, and short-term memory was intact. (Tr. 46-47).

Derry testified that he had episodes of crying spells and emotional breakdowns. (Tr. 47). He indicated that his uncontrollable crying had lasted at least an hour and, rarely it would last up to four hours. (Tr. 47). The ALJ noted that episodes like this, if frequent enough, interfered with concentration, persistence, or pace. (Tr. 47). The VE testified that three absences or

unauthorized departures per month would preclude employment. (Tr. 47). The ALJ found that Derry had not shown that he had or was expected to have a period of 12 months of crying spells that would interfere with his employment. (Tr. 47).

The ALJ indicated that after the alleged onset date Derry's mood was better after a medication change. (Tr. 47). Derry reported that he had made plans to attend school and to care for his sick aunt, and that he was experiencing little depression. (Tr. 47). In November 2012, Derry reported that he was sharp with others but that he was not experiencing any depression. (Tr. 47). On December 14, 2012, Derry indicated for the first time since his alleged onset date that he had mood changes of sadness and tearfulness. (Tr. 47).

In January of 2013, Derry spent two days as an in-patient. (Tr. 47). Derry was crying, overwhelmed, and depressed, which the mental health professionals attributed to him running out of medication. (Tr. 47). Derry was restarted on his medications, with a slight change, and in late January reported that his mood was stable and he had no racing thoughts or thoughts to harm himself or others. (Tr. 47). In February 2013, Derry reported to a few bad days, but in March of 2013 he complained of feelings of anger. (Tr. 47). In April, June, and July of 2013, his crying spells occurred once or more per week. (Tr. 47). In August, after being compliant with his medications, a treating board-certified clinical nurse indicated that he was slightly better. (Tr. 47).

However, a few days later in August, Derry took an excessive dose of prescription medication and was treated as an in-patient at Parkview Hospital for six days and later released with follow up out-patient therapy. (Tr. 47). Derry indicated that it was not a suicide attempt. (Tr. 47). He became compliant with his medications and was reported as "slightly better" until he ran out of medication in November 2013. (Tr. 47). A clinical nurse specialist reported in

January of 2014 that Derry was much better, although he had paranoid thoughts and some impaired recent memory. (Tr. 47-48). Derry reported that in the past three months he had only one bad mood swing. (Tr. 48).

The ALJ noted that the record indicated that Derry had frequent emotional breakdowns from April through July of 2013, however, that was less than the 12 months as required by the Social Security regulations. (Tr. 48). Also, the ALJ found that Derry had experienced episodes of decompensation, but none of extended duration. (Tr. 48). The ALJ noted that Derry was an in-patient in January of 2013 because of having run out of medications and in August 2013 as a result of an intentional recreational overdosing on prescription medication. (Tr. 48). Derry did not satisfy the paragraph B criteria because his mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration. (Tr. 48).

Additionally, the ALJ found that Derry did not meet the requirements for paragraph C. (Tr. 48). She indicated that Derry did not have repeated episodes of decompensation and concluded that a marginal adjustment in mental demands or an environmental change would not cause Derry to decompensate. (Tr. 48). The ALJ also stated that there was no evidence that Derry could not function outside his home or a highly supportive living arrangement. (Tr. 48).

The ALJ then assessed Derry's residual function capacity (RFC) as follows:

> the claimant has the residual function capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can lift, carry, push and pull 50 pounds occasionally and 25 pounds frequently; can stand or walk for approximately 6 hours out of an 8-hour workday; can sit for approximately 6 hours out of an 8-hour workday, with normal breaks; can frequently climb ramps and stairs; can frequently balance, stoop, kneel, crouch, and crawl; can occasionally climb ladders, ropes, or scaffolds; must avoid frequent exposure to extreme cold, unprotected heights and open and dangerous machinery; cannot engage in complex or detailed tasks, but can perform simple,

5

> routine, repetitive tasks consistent with unskilled work; can sustain and
> attend to tasks throughout the eight-hour workday; is limited to
> superficial interaction with coworkers, supervisors and the public, with
> superficial interaction defined as occasional and casual contact not
> involving prolonged conversation or discussion of involved issues, but
> contact with supervisors still involves necessary instruction; is best
> suited to working in semi-isolation from others or as part of a small
> group; is limited to low stress work defined as having only occasional
> decision-making required and with only occasional changes in the work
> setting; and is limited to work with no production rate or pace work.

(Tr. 48-49). The ALJ explained that in considering Derry's symptoms she followed a two-step process. (Tr. 49). First, she determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical and laboratory diagnostic technique that reasonably could be expected to produce Derry's pain or other symptoms. (Tr. 49). Then, she evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Derry's functioning. (Tr. 49).

Derry testified to living with his parents and helping care for his mother who was ill. (Tr. 49). Also, he drove to the grocery store and ran other errands for two to three hours per week. (Tr. 49). He testified that while working he would have "emotional breakdowns" once every week or every two weeks. (Tr. 49). These breakdowns consisted of uncontrollable crying lasting at least an hour, but some lasted up to four hours. (Tr. 49). Also, he had paranoid illusions that others were laughing at him. (Tr. 49). Derry was being treated by Viann Ellsworth, a board-certified clinical nurse specialist, at Park Center with prescriptions and therapy with a caseworker/social worker. (Tr. 49). Derry reported that the medications were effective and his only side-effects were occasional twitches, jaw grinding, and longer periods of sleep. (Tr. 50).

Derry testified that in January of 2013 he ran out of medication and went to Parkview Behavioral Health facility on an emergency basis for thoughts of harming himself and/or others.

(Tr. 50). Derry also testified to a prescription overdose that occurred in August 2013. (Tr. 50). After the overdose, Derry was treated as an in-patient at Parkview Hospital for six days and then released to follow up with out-patient therapy. (Tr. 50). Derry stated that he was nervous when he was out of the house in a social situation. (Tr. 50). However, the ALJ noted that he was able to get together with others to play tabletop games for a couple hours at a time and that he kept in touch with friends he knew from Texas when he lived there. (Tr. 50).

Derry reported to the psychologist who performed the consultative examination in April of 2013 that he had emotional breakdowns that consisted of uncontrollable crying and that he had very little energy or motivation, which prevented him from doing much. (Tr. 50). He characterized his mood as rage and anger. (Tr. 50). Also, Derry indicated that he had happy moods marked by shopping sprees and excessive spending but that he had occasional thoughts of seriously harming others. (Tr. 50). The ALJ found that Derry's medically determinable impairments reasonably could cause the alleged symptoms, but she found that Derry was incredible regarding the intensity, persistence, and limiting effects of the symptoms. (Tr. 50).

The ALJ indicated that Derry received various Global Assessment of Functioning (GAF) scores from both his own mental health providers and from the psychologist who performed the consultative examination. (Tr. 51). The ALJ noted in February 2013, Derry received a score of 45 and in January 2014 a score of 47. (Tr. 51). However, the ALJ gave little weight to the scores because they were assigned by a licensed mental health counselor and a clinician. (Tr. 51). Also, the ALJ noted that the scores were disproportionate with the consultative psychologist's score of 60 assigned in April 2013 and the scores of 50 from medical doctors in August 2012. (Tr. 51). The ALJ found that the GAF score of 60 was consistent with the findings of the State agency. (Tr. 51). The ALJ noted that Derry's GAF scores of 50 were

7

technically in the severe range for occupational and/or social functional difficulties, but verged onto the moderate range being one point below it. (Tr. 51). The ALJ indicated that GAF scores incorporate issues outside mental impairment like housing, employment, and financial problems. (Tr. 51). Therefore, the ALJ found that without those factors, Derry's GAF score of 50 was in the moderate range. (Tr. 51).

The ALJ assigned great weight to the State agency's psychological consultants because their opinions were consistent with Derry's psychological care and evaluation. (Tr. 51). The ALJ discounted the allegations made by Derry's father because substantial reasons existed in the medical evidence, or lack thereof medical evidence, to discount the limiting effects of Derry's problems. (Tr. 51).

At step four, the ALJ found the Derry was unable to perform any past relevant work. (Tr. 51). Considering Derry's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that he could perform, including a laundry worker (3,000 jobs statewide and 150,000 nationwide), an industrial cleaner (2,000 jobs statewide and 60,000 nationwide), and a dishwasher (3,000 statewide and 200,000 nationwide). (Tr. 52). The ALJ noted that the VE indicated that the numbers of dishwasher jobs would be reduced by approximately half when the work would take place in semi-isolation or in a small group. (Tr. 53).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");

8

*Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098. A court must affirm an ALJ's decision if the ALJ supported her findings with substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §§ 404.1520, 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b), 416.920(b)**. If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work

9

activities." **20 C.F.R. §§ 404.1520(c), 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e)**. However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

First, Derry has argued that the ALJ failed to incorporate her findings that he had a moderate degree of limitation in concentration, persistence, or pace into the hypothetical question posed to the VE. The ALJ's RFC assessment and the hypothetical posed to the VE must incorporate all of the claimant's limitations supported by the medical record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)); *Indoranto v. Barnhart*, 374 F.3d 470, 473–74 (7th Cir. 2004) ("If the ALJ relies on testimony from a vocational expert, the hypothetical question she poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record."). That includes any deficiencies the claimant has in concentration, persistence, or pace. *Yurt*, 758 F.3d

at 857; ***O'Connor-Spinner***, 627 F.3d at 619 ("Among the limitations the VE must consider are deficiencies of concentration, persistence and pace."); ***Stewart v. Astrue***, 561 F.3d 679, 684 (7th Cir. 2009) (indicating the hypothetical question "must account for documented limitations of 'concentration, persistence, or pace'") (collecting cases). The most effective way to ensure that the VE is fully apprised of the claimant's limitations is to include them directly in the hypothetical. ***O'Connor-Spinner***, 627 F.3d at 619.

However, ALJs do not need to state explicitly "concentration, persistence, or pace" in the hypothetical for all cases. ***Yurt***, 758 F.3d at 857; ***O'Connor-Spinner***, 627 F.3d at 619. Rather, a court may assume a VE's familiarity with a claimant's limitations, despite deficiencies in the hypothetical, when the VE independently reviewed the medical record or heard testimony directly addressing those limitations. ***O'Connor-Spinner***, 627 F.3d at 619; ***Simila v. Astrue***, 573 F.3d 503, 521 (7th Cir. 2009). This exception does not apply if the ALJ poses a series of increasingly restrictive hypotheticals because courts infer that the VE's attention is focused on the hypotheticals and not the record. ***O'Connor-Spinner***, 627 F.3d at 619; ***Young v. Barnhart***, 362 F.3d 995, 1003 (7th Cir. 2004). The ALJ posed a series of increasingly restrictive hypotheticals. (Tr. 86-88). Therefore, this exception does not apply.

An ALJ's hypothetical may omit "concentration, persistence, or pace" when it is manifest that the ALJ's phrasing specifically excluded tasks that someone with the claimant's limitations could not perform. ***O'Connor-Spinner***, 627 F.3d at 619. For example, courts have upheld hypotheticals that restricted a claimant to low-stress work when the limitations were stress or panic related. *See* ***Johansen v. Barnhart***, 314 F.3d 283, 285, 288–89 (7th Cir. 2002) (upholding a hypothetical formulated in terms of "repetitive, low-stress" work because the description eliminated positions likely to trigger symptoms of the panic disorder that originated the

11

claimant's moderate limitations in concentration, persistence, or pace); ***Arnold v. Barnhart***, 473 F.3d 816, 820, 823 (7th Cir. 2007) (upholding a hypothetical that restricted the claimant to low-stress, low-production work when stress-induced headaches, frustration, and anger caused the claimant's difficulties in concentration, persistence, or pace). The ALJ's question limited Derry to low stress work, however, his limitations were not stress or panic related.

Courts may uphold a hypothetical that does not mention "concentration, persistence, or pace" when the underlying conditions were mentioned and the link between the underlying condition and the concentration difficulties was apparent enough to incorporate those difficulties by reference. *See* ***Simila***, 573 F.3d at 521–22 (upholding the hypothetical but indicating the failure to include the specific limitations was "troubling"). Generally, terms like "simple, repetitive tasks" alone do not exclude from the VE's consideration those positions that present significant problems with concentration, persistence, or pace. ***Stewart***, 561 F.3d at 684–85 (finding hypothetical limited to simple, routine tasks did not account for limitations of concentration, persistence, or pace); *see* ***Kasarsky v. Barnhart***, 335 F.3d 539, 544 (7th Cir. 2003) (posing hypothetical as individual of borderline intelligence did not account for limitations of concentration). Derry has argued that the ALJ did not mention his underlying conditions in the hypothetical, and the Commissioner has not disputed that argument. Therefore, this exception does not apply.

The ALJ found that Derry had moderate difficulties in concentration, persistence, or pace. (Tr. 46-47). The ALJ's hypothetical included the following mental limitations:

> The individual is unable to engage in complex or detailed task but can perform simple routine repetitive tasks consistent with unskilled work and is able to sustain an [INAUDIBLE] tasks throughout the workday. The individual is limited to superficial interaction with co-workers, supervisors and the public with superficial interaction defined as occasional and casual contact not involving prolonged conversation or discussion of involved

12

> issues. Contact with supervisors still involves necessary instruction. In addition, the individual is limited to low stress work defined as having only occasional decision making required and only occasional changes in the work setting.

(Tr. 86-87). Based on the hypothetical the VE determined that Derry could not perform his past relevant work but that he could perform other work that existed in significant numbers in the national economy. (Tr. 87).

The ALJ included a limitation to a low stress job requiring only occasional decision making and only occasional changes in the work setting. (Tr. 87). Derry acknowledged that a hypothetical that restricts a claimant to low stress work is proper when the mental limitations are stress or panic related. ***Johansen v. Barnhart***, 314 F.3d 283, 288 (7th Cir. 2002). However, he has argued that the ALJ did not indicate in her decision that Derry's mental limitations were primarily stress or panic related. Also, Derry has argued that changes in work settings are related to adaptation, rather than the ability to sustain concentration and persistence.

The Commissioner has argued that the ALJ did not err because she relied on relevant evidence in the record, Derry's mental status exam, his daily activities, reactions to his medications, and medical opinions in finding that Derry had moderate difficulties in concentration, persistence, or pace. The ALJ noted that during the consultative mental status exam Derry had well developed arithmetic skills and displayed intact long-term and intermediate memory. (Tr. 46-47). The ALJ found that when he was compliant with his medications his mood was stable.

Also, the Commissioner contends that the ALJ relied on the opinions of Ken Lovko, Ph.D. and Donna Unversaw, Ph.D., State agency psychologists. The ALJ assigned great weight to their opinions that Derry did not have adaptation limitations and could manage the stresses involved with semiskilled work. (Tr. 98,121). If a medical expert makes an RFC determination,

13

the ALJ may reasonably rely on that opinion to formulate a hypothetical posed to a VE. ***Johansen v. Barnhart***, 314 F.3d at 289; *see* ***Calhoun v. Colvin,*** 2013 WL 3834750, at *10 (N.D. Ind. 2013) (upholding a hypothetical to a VE when the ALJ did not include a limitation in concentration, persistence, and pace but relied almost verbatim on a medical expert's RFC).

The Commissioner has indicated that the ALJ used alternative phrasing to address the complexity of the tasks that Derry could perform and his ability to stick with a given task over a sustained period of time. The ALJ limited Derry to "simple, routine and repetitive tasks consistent with unskilled work," and the additional limitations to "low stress work defined as only occasional decision-making required and with only occasional changes in the work setting." The Commissioner has indicated that even if the ALJ did not identify any specific stress or panic related problems, in her opinion she reported a basis for the functional limitations by noting that Derry was limited to semi-isolation from others, low stress tasks, and no production pace work to give deference to Derry's depression and paranoid thoughts around others.

The hypothetical the ALJ presented to the VE was not supported by the medical record. Therefore, the ALJ failed to build an accurate and logical bridge from her evidence to the record. ***Steele***, 290 F.3d at 941. The appropriateness of a hypothetical question posed to a vocational expert, "[a]ll that is required is that the hypothetical question be supported by the medical evidence in the record." ***Meredith v. Bowen***, 833 F.2d 650, 654 (7th Cir. 1987).

The ALJ's hypothetical fails to account for Derry's limitations in concentration, persistence, or pace and only accounts for "simple, routine, competitive tasks," which the 7th Circuit has indicated is insufficient. ***Stewart***, 561 F.3d at 684–85. Next, the hypothetical limits Derry to superficial interaction with coworkers, supervisors, and the public with superficial interaction defined as occasional and casual contact not involving prolonged conversation or

14

discussion of involved issues. In addition, Derry was best suited work in semi-isolation from others or as part of a small group. The circuit court repeatedly has rejected the notion that a hypothetical confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace. ***Yurt v. Colvin,*** 758 F.3d 850, 858–59 (7th Cir. 2014); *See generally **Stewart***, 561 F.3d at 685. The hypothetical also limits Derry to work with no production rate or work pace. However, without such a definition, it was impossible for the VE to assess whether a person with Derry's limitations could maintain the pace proposed. ***Varga v. Colvin***, 794 F.3d 809, 815 (7th Cir. 2015).

Finally, the ALJ limits Derry to low stress work related to having only occasional decision making and only occasional changes in the work setting. First, a hypothetical that restricts a claimant to low-stress work is proper when the mental limitations are stress-related or panic-related. ***Johansen v. Barnhart***, 314 F.3d 283, 288 (7th Cir. 2002). The record is devoid of any stress or panic related mental limitations. Next, "few if any work place changes" with limited "interaction with coworkers or supervisors" deals largely with workplace adaptation, rather than concentration, pace, or persistence. ***Varga,*** 794 at 815. The ALJ should include Derry's limitations in concentration, persistence, and pace in the VE hypothetical on remand.

Next, Derry has argued that the ALJ improperly evaluated his GAF scores. The GAF scale measures a "clinician's judgment of the individual's overall level of functioning." ***Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,*** 32–34 (Text Revision, 4th ed. 2000). The established procedures require a mental health professional to assess an individual's current level of symptom severity and current level of functioning, and adopt the lower of the two scores as the final score. ***Am. Psychiatric Ass'n, Diagnostic & Statistical***

*Manual of Mental Disorders,* 32–34 (Text Revision, 4th ed. 2000). A GAF score ranging from 41–50 indicates serious symptoms; scores ranging from 51–60 indicate moderate symptoms; and scores ranging from 61–70 indicate mild symptoms. *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,* 32–34 (Text Revision, 4th ed. 2000). GAF scores are "useful for planning treatment" and are measures of both severity of symptoms and functional level. *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,* 32–34 (Text Revision, 4th ed. 2000). "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Wilkins v. Barnhart*, 69 Fed. Appx. 775, 780 (7th Cir. 2003) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).

Derry has argued that the ALJ improperly evaluated his GAF scores by assigning more weight to a particular score. Derry indicated that his bipolar disease was an episodic disease, therefore, the scores depicted functioning at the time of the rating. The ALJ noted that two of Derry's scores were surprisingly low: 45 in February of 2013 and 47 in January of 2014. (Tr. 51). However, the ALJ gave those scores little weight because they were assigned by a licensed mental health counselor and by a clinician. (Tr. 51). This was proper because to be an "acceptable medical source," the health care professional must be a licensed physician or a licensed or certified psychologist. **20 C.F.R. 416.913(a)(1)-(2).** Also, the scores were inconsistent with the GAF score of 60 assigned by the consultative psychologist in April 2013 and the GAF score of 50 assigned by medical doctors in August 2012. (Tr. 51). It was permissible for the ALJ to give greater weight to the GAF score that was more consistent with the remainder of the record*. Oneal v. Colvin*, 2015 WL 1291891, at *4 (S.D. Ind. 2015).

16

Derry has argued that the ALJ claimed that GAF scores incorporate issues outside of the mental impairment like housing, employment, and financial problems was err. However, this argument "amounts to nothing more than a dislike of the ALJ's phraseology." *Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir. 2004). Derry indicated that the ALJ chose to discuss the GAF scores, therefore, an improper evaluation was error. Finally, Derry has argued that the ALJ noted that he had missed appointments and was out of medications but that she failed to inquire with Derry or his treating sources as to the reasoning.

A low GAF score alone is insufficient to overturn an ALJ's finding of no disability. *See Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010). The ALJ adequately articulated the GAF scores and explained her evaluation of Derry's scores. Therefore, the ALJ was able to build an accurate and logical bridge from the evidence to her conclusion. *Steele*, 290 F.3d at 941.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED** for further proceedings consistent with this order.

ENTERED this 28th day of February, 2017.

/s/ Andrew P. Rodovich
United States Magistrate Judge